# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

_____
)
**ERICKA V. KEM f/k/a,** )
**ERICKA V. SANDOVAL** )
)
**Plaintiff,** )
)
v. )   **CIVIL ACTION**
)   **NO. 16-40172-TSH**
**NANCY A. BERRYHILL,** )
**Acting Commissioner of Social Security,** )
)
**Defendant.** )
_____ )

**ORDER AND MEMORANDUM ON PLAINTIFF'S MOTION FOR ORDER
REVERSING DECISION OF COMISSIONER (Docket No. 18) AND DEFENDANT'S
MOTION FOR ORDER AFFIRMING DECISION OF COMMISSIONER (Docket No. 20)**

**December 11, 2018**

**HILLMAN, D.J.**

This is an action for judicial review of a final decision by the Commissioner of the Social

Security Administration ("Commissioner") denying the application of Ericka Kem ("Plaintiff")

for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI") benefits because the Commissioner held that Plaintiff's impairments did not render her

disabled. Plaintiff has filed a Motion for Order Reversing the Decision of the Commissioner

(Docket No. 18), and the Commissioner has filed a cross Motion to Affirm the Commissioner's

Decision. (Docket No. 20). For the reasons set forth below, Plaintiff's motion (Docket No. 18) is

_**granted**_ and Defendant's motion (Docket No. 20) is _**denied**_.

## **Background**

### *1. Procedural History*

On March 24, 2014, Plaintiff filed for DIB and SSI. (AR 32, 211-212, 218-228). Plaintiff claimed she was unable to work since March 4, 2014. (AR 211, 218). Both applications were denied. (AR 129-134, 139-144). A hearing was subsequently held before an Administrative Law Judge ("ALJ") on July 28, 2015. (AR 48-74). On August 31, 2015, the ALJ found that Plaintiff was not disabled. (AR 26-42). On October 18, 2016, the Appeals Council denied Plaintiff's request for review (AR 4-9), thus making the ALJ's decision the final decision of the Commissioner. Plaintiff has exhausted her administrative remedies, and this case is therefore now ripe for review under 42 U.S.C. §§ 405(g) and 1383(c)(3).

### *2. Medical History*

On January 9, 2014, Dr. Cruz wrote that Plaintiff was "diagnosed with depression and anxiety. Due to increased stress exacerbation of her depression/anxiety, we recommend that patient changes her job title/job position." (AR 426). Plaintiff's depression and anxiety were caused by several factors including a traumatic childhood in a warzone and being sexually abused in her early twenties. (AR 640; 565).

On January 16, 2014, Plaintiff was admitted to the neurological department at UMass Memorial Medical Center for numbness on her left side and the possibility of a seizure. (AR 408). The attending physician found Plaintiff alert and oriented to three spheres, she seemed anxious but not agitated, her fluency and comprehension were normal, there was no pronator drift, and she had a mild slightly high amplitude tremor in her bilateral upper extremities. (AR 411). Further, Plaintiff's strength was observed as five out of five, she had decreased sensation in her face and left upper extremity, her Romberg test was negative, and her cerebellar function and gait were

normal. (AR 411). While she was hospitalized, Plaintiff had an EEG which was normal and a CT scan of her head which revealed numerous scattered calcifications throughout both cerebral hemispheres that could represent sequalae of prior granulomatous disease. (AR 414). On January 18, Plaintiff was discharged with a prescription for an increased dose of Tegretol. (AR 408).

On January 27, 2014, following her hospitalization, Dr. Jennifer Moodie wrote, "no driving for 6 months. Activity as tolerated, no heavy weight lifting, no pushing or pulling of heavyweights, no strenuous activity, do not lock bathroom doors from inside when alone at home. Diet should be containing less than 2 g of sodium per day." (AR 472).

On March 11, 2014, Dr. Cruz wrote that Plaintiff "has symptoms of depression and anxiety due to her work." (AR 425). On March 27, 2014, Courtney Petter, LMHC, completed a Psychiatric Disorder Form. (AR 485-487). Ms. Petter concluded that Plaintiff's Global Assessment of Functioning ("GAF") score was 56,[1] she was oriented to three spheres, and there were no concentration and attention deficits (AR 485). Further, Ms. Petter diagnosed Plaintiff with major depressive disorder. *Id.*

On March 28, 2014, Dr. Cruz saw Plaintiff, who complained that she was continuing to have memory problems. He noted she was "working in housekeeping" though recently, she slipped and fell on her right side. (AR 491). Dr. Cruz also recommended that Plaintiff speak with a neurologist about her memory loss and headaches. (AR 492). Dr. Cruz opined that Plaintiff's "memory loss can be due to her depression/anxiety. This can also be due to the Topamax medication. However, we cannot stop this medication because of his or her seizure." (AR 494).

---

[1] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM–IV) 34 (4th ed., text rev. 2000).

During the summer of 2014, Plaintiff began treating with Margot Pagan, MA. In her initial assessment, Ms. Pagan assigned Plaintiff a GAF score of 56 and noted Plaintiff suffered from anxiety and depression. (AR 532-42). Plaintiff continued treating with Ms. Pagan through July 2015. During that time, Ms. Pagan Ms. Pagan noted Plaintiff was "extremely challenged by symptoms of depression" (AR 805) and found no significant changes in Plaintiff's mood/affect, thought process/orientation, behavior/functioning, or medical conditions. (AR 790-827, 848-860).

On July 28, 2014, Plaintiff again presented to UMass Memorial Medical Center. Dr. Butler noted that Plaintiff had a few beers the night before and then had intentionally taken more than 10 Baclofen in a suicide attempt. (AR 576). Her suicide risk assessment tools noted severe depression, preoccupation with hopelessness, despair, feelings of worthlessness, and continued suicidal thoughts. *Id.* On assessment, Plaintiff was anxious, crying, and depressed. *Id.* In addition, Dr. Butler found Plaintiff to be a low suicide risk. (AR 570). The same day, Plaintiff was seen by Michael Lebeaux, a therapist affiliated with Community Health Link, and he assigned her a GAF score of 50.[2] (AR 645).

On August 5, 2014, Plaintiff treated with Ronald Gobeil, DO. (AR 564). Plaintiff reported being depressed and anxious. Dr. Gobeil reported that Plaintiff was dysphoric over her job situation and hesitant to find a new job, maybe because she feared a similar situation as her last job where she had problems with a co-worker. (AR 564). Two days later, Plaintiff again treated with Dr. Cruz. Plaintiff informed Dr. Cruz about her suicide attempt and Dr. Cruz noted that she presented with depression. (AR 549).

On October 21, 2014, Plaintiff was treated at the neurology clinic and reported that she had a seizure the previous weekend. Plaintiff reported "deep depression" and that Topamax was

---

[2] A GAF score between 41 and 50 indicates severe symptoms or severe difficulty in social, occupational or school functioning. *See* DSM–IV 34.

worsening he memory problems. On examination, Drs. Chu and Ramirez found that Plaintiff denied suicidal ideation, she was alert and oriented to three spheres, her upper extremity strength was rated as five out of five, her lower extremity strength was four plus out of five, and her sensation, gait, cerebellar function, and coordination were normal. (AR 565, 567). Further, Dr. Chu concluded that Plaintiff's seizures were uncontrolled and therefore ordered an extended EEG and increased her dosage of carbamazine. (AR 568). On October 26, 2014, Plaintiff was again treated at the UMass Memorial Medical Center and reported that she had a seizure. The EMT reported, however, that it appeared that she had a panic attack. (AR 785).

On June 3, 2015, John Fleming, LMHC, RN, noted that Plaintiff reported experiencing increased stress, resulting in increased anxiety and depression (AR 649). Nurse Fleming then found Plaintiff was oriented to four spheres, she was not experiencing any delusions or hallucinations, her though process was linear, she was easily engaged with a tearful affect at times, and she had passive suicidal ideation with no intent. (AR 651). Further, Nurse Fleming assigned Plaintiff a GAF score of 55. (AR 657).

Plaintiff continued to receive treatment from Island Counseling Center through July 2015. (AR 680-691). During that period, Dr. Gobeil noted that Plaintiff was anxious, depressed, and dysphoric. *Id.*

From June 11, 2015 to July 17, 2015, Plaintiff participated in an outpatient day program. (AR 692-717). Notes from the program reflect Plaintiff being observed as "upset" and "really depressed." (AR 690; 694). Dr. Nesr, a psychiatrist, diagnosed Plaintiff with PTSD, depression, and anxiety. (AR 706). In addition, she was assigned a GAF score of 45. (AR 710).

On June 16, 2015, Plaintiff presented to the ER for facial numbness. (AR 740). It was noted that due to her ongoing seizures, "all seizure precautions apply for 6 months from the date

of the last seizure." (AR 741). The same day, Plaintiff had a CT scan of her head that revealed no acute abnormalities and was unchanged from the prior scan in January 2014. (AR 747). The next day, Plaintiff treated with Dr. Gobeil. She appeared anxious and depressed. (AR 62). On June 30, 2015, Plaintiff reported intense anxiety to Ms. Pagan. On July 22, 2015, Plaintiff reported to Ms. Pagan that she was feeling better after a three-day hospitalization. (AR 858).

On July 14, 2015, Plaintiff again presented to UMass memorial Medical Center complaining of suicidal thoughts, stating that she did not want to live and wanted to take pills. (AR 762). On examination, the attending provider found Plaintiff alert and oriented to three spheres, her affect was anxious, she was crying, and her speech was normal. (AR 763, 767). The same day, Ms. Pagan submitted a Mental Medical Source Statement. (AR 661-666). Ms. Pagan noted that she had been treating Plaintiff biweekly since June 20, 2014 and wrote that Plaintiff had "severe symptoms of depression according to a major depression inventory (7/14/15) severe symptoms of anxiety according to the Hamilton [A]nxiety [S]cale." Further, Ms. Pagan noted Plaintiff's "severe difficulties" recovering and need for long-term continued care to overcome her symptomology. (AR 661). According to Dr. Pagan, Plaintiff would be unable to complete a normal workday and workweek without interruptions form her symptom's accept instructions and respond appropriately to criticism, respond properly to changes in routine work setting, deal with normal work stress, be aware of normal hazards, and take appropriate precautions. She found Plaintiff would be off task 25% of the day and absent six days or more a month due to her mental health symptoms. (AR 666).

Similarly, on July 16, 2015, Dr. Gobeil completed a Mental Medical Source Statement. He concluded that Plaintiff would be unable to complete a normal workday and workweek without interruptions from her symptoms, accept instructions and respond appropriately to criticism,

respond properly to changes in routine work setting, deal with normal work stress, and be aware of normal hazards and take appropriate precautions. According to Dr. Gobeil, Plaintiff "would be off task 33% of the day and absent six days or more a month due to her mental health symptoms." (AR 666).

On July 22, 2015, Dr. Cruz again concluded that Plaintiff was disabled because "she gets anxious at work. She has no energy to do things due to depression." (AR 720). In his opinion, Plaintiff would be absent from work more than three days per month and off task more than 30% of the day if she returned to work. *Id.* Therefore, he concluded "within a reasonable degree of medical certainty" that Plaintiff was "unable to obtain and retain work in a competitive work environment, 8 hours per day, 5 days per week." *Id.*

### 3. *Hearing Testimony*

On July 28, 2015, Plaintiff testified at a hearing before the ALJ. She testified that she did not feel like she had improved since March of 2015 and that she continued to treat at a mental health facility Monday to Friday 9:00 a.m. to 3:00 p.m. (AR 54). Further, she said that she left her previous job because of stress and worsening depression. (AR 55). Plaintiff told the ALJ that she cries frequently, struggles with concentration, and has panic attacks approximately three times per week. (AR 56; 62). Finally, Plaintiff testified that she tried to work as a housekeeper but she "was very, very slow and . . . got a complaint from [her] supervisor, and . . . somedays [she] was okay, and other days [she] was very anxious, and depressed and crying and . . . couldn't do the job." (AR 62).

### **Standard of Review**

This Court may not disturb the Commissioner's decision if it is grounded in substantial evidence. 42 U.S.C. 405(g); 1383(c)(3). Substantial evidence exists when there is sufficient evidence that a reasonable person could agree with the conclusion. *Rodriguez v. Sec'y of Health*

& *Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). Thus, this Court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion, even if the administrative record could support multiple conclusions." *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (quotation marks and citation omitted).

## Standard of Entitlement to Social Security Disability Insurance

A claimant is disabled for purposes of DIB if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Unable to engage in any substantial gainful activity" means the claimant "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

The Commissioner assesses a claimant's impairment under a "five-step sequential evaluation process" outlined in the statute. *See* 20 C.F.R. § 404.1520.

The hearing officer must decide: (1) whether the claimant is engaged in "substantial gainful activity"; (2) whether the claimant suffers from a "severe impairment"; (3) whether the impairment "meets or equals" one of the listed impairments contained in Appendix 1 to the regulations; (4) whether the claimant's residual functional capacity ("RFC")[3] precludes him from engaging in

---

[3] Before proceeding to steps four and five, the Commissioner must assess the claimant's ("RFC"), which the Commissioner applies at step four to determine whether the claimant can perform past relevant work and at step five to determine if the claimant can perform any other work. *See* 20 C.F.R. § 404.1520. "RFC is an administrative assessment of the extent to which an individual's medically determinable

8

previous relevant employment; and (5) whether the claimant's RFC precludes him from doing any work considering the claimant's age, education, and work experience. *Id*. If the hearing officer concludes at any step of the evaluation process that the claimant is or is not disabled, the inquiry does not continue to the next step. *See id.*

The claimant has the burden of showing that he is disabled through step four of the analysis. At step five, however, the burden shifts to the Commissioner who must show that there are jobs in the national economy the claimant can perform notwithstanding his impairments. *See Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 7 (1st Cir. 1982).

## The ALJ's Decision

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 4, 2014, the alleged onset date of her disability. (AR 35). At step two, the ALJ determined that Plaintiff's "seizure disorder/cysticercosis, anxiety/post-traumatic stress disorder (PTSD), depression, [and] cervicalgia" were severe impairments. *Id.* At step three, the ALJ held that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in" Appendix 1 to the regulations. (AR 39). Then, the ALJ found that Plaintiff had the RFC to perform:

> [T]he full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b), however she could not be exposed to hazardous equipment or unprotected heights, and could remember and carry out no more than simple instructions, and could have no more than occasional contact with others.

(AR 40). At step four, the ALJ found that Plaintiff "is capable of performing past relevant work as a document imaging specialist. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity." (AR 41). Alternatively, the

impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

ALJ found that at step five of the analysis, that "considering the claimant's age, education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that [Plaintiff] also can perform." *Id.* Consequently, the ALJ held that Plaintiff "has not been under a disability, as defined in the Social Security Act, from March 4, 2014, through the date of this decision." (AR 42).

## Discussion

### *1. Lay Knowledge*

"With a few exceptions . . . an ALJ, as a lay person is not qualified to interpret raw data in a medical record." *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996). Therefore, for an ALJ to make a disability determination, "an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person." *Santiago v. Sec'y of Health & Human Servs.*, 944 F.3d 1, 7 (1st Cir. 1991). In addition, an ALJ may not simply disregard relevant evidence, particularly when that evidence bolsters the claimant's entitlement to benefits. *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ was not at liberty to ignore medical evidence or substitute his own views for uncontroverted medical opinion."); *Dedis v. Chater*, 956 F. Supp. 45, 51 (D. Mass 1997) ("While the ALJ is free to make a finding which gives less credence to certain evidence, he cannot simply ignore . . . the body of evidence opposed to . . . [his] view.") (quotation marks and citations omitted).

Plaintiff argues that the ALJ substituted his lay knowledge for uncontroverted medical evidence to formulate Plaintiff's RFC. The ALJ concluded that Plaintiff "has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b), however she could not be exposed to hazardous equipment or unprotected heights,

and could remember and carry out no more than simple instructions, and could have no more than occasional contact with others." (AR 40). Defendant argues that in formulating this RFC, the ALJ relied on the opinions of Dr. Bahnassi, Dr. Nesr, and Courtney Petter, LMHC, all of which he gave moderate weight. (AR 38-39).

### a. Dr. Bahnassi

On March 12, 2013, Dr. Bahnassi found that Plaintiff was alert and oriented to three spheres, there was no evidence of overt psychosis, her memory and cogntivie functioning were at baseline, her thought process was goal-oriented, her speech was normal, and she had no looseness of associations or flights of ideas. (AR 379). Two months later, Dr. Bahnassi observed that Plaintiff was again oriented to three spheres, her affect was appropriate, her speech was normal, her memory and cognitive functioning were at baseline, her insight and judgment were fair, and there was no evidence of overt psychosis or suicidal ideation. (AR 378). Thereafter, however, it does not appear that Plaintiff continued treating with Dr. Bahnassi. Since Plaintiff alleged disability beginning on March 14, 2014, Dr. Bahnassi's records are simply not probative of a disability beginning almost one year later. Therefore, Dr. Bahnassi's findings do not support the ALJ's RFC determinations.

### b. Dr. Nesr

Although Dr. Nesr assigned Plaintiff a GAF of 45, the ALJ concluded that Dr. Nesr did not feel Plaintiff's symptoms were work preclusive. (AR 37). *See Querido v. Barnhart*, 344 F. Supp. 2d 236, 246 (D. Mass. 2004) (concluding that a raw GAF score, "without more, does not give a fact finder significant insight into whether [Plaintiff] can perform some type of competitive work" since a score of 41-50 indicates "serious symptoms . . . OR any serious impairment in social, occupational, or school functioning." (citing DSM–IV 34). The ALJ cited Dr. Nesr's findings that

Plaintiff's memory was adequate, her mood was calm, and her manner cooperative as evidence that Dr. Nesr did not believe that Plaintiff's condition precluded employment. (AR 707; 37). This conclusion, however, is quite the inferential leap. Indeed, on the same page in the record, Dr. Nesr noted that Plaintiff was overwhelmed, depressed, and entertained thoughts of self-harm. *Id.* Therefore, it is difficult to extrapolate from Dr. Nesr's findings that Plaintiff had the RFC to engage in meaningful employment especially when his description of Plaintiff's symptoms is considered in conjunction with the GAF assessment.

### c. LMHC Petter

The ALJ also gave moderate weight to the opinion of LMHC Petter. Ms. Petter found that Plaintiff was depressed, anxious, and struggled to cope with the traumas she had experienced. (AR 863). Ms. Petter noted that Plaintiff's issues with her male coworker triggered her trauma issues. *Id.* In Ms. Petter's opinion, Plaintiff "was debilitated [by] her extreme depressive and anxious symptoms, as well as the seizures." (AR 863). Similar to the evidence from Dr. Nesr, it is difficult to infer an RFC permitting a full range of light work from Ms. Petter's conclusions. The only evidence in Ms. Petter's records that would seem to support the ALJ's finding is that she assigned Plaintiff a GAF score of 56. (AR 485). But "[t]he GAF is a diagnostic tool developed by an association of medical professionals; it was not intended to be a yardstick for measuring disabilities within the scope of the Social Security Act." *Resendes v. Astrue*, 780 F. Supp. 2d 125, 138 (D. Mass. 2011). Thus, without more, it was improper for the ALJ to base an RFC finding on Plaintiff's GAF score.

Consequently, I find that the ALJ necessarily relied on his lay opinion in formulating the RFC as there was no substantial evidence in the parts of the record on which he relied that could have reasonably supported his findings. *Cf. Yearling v. Colvin*, 292 F. Supp. 3d 515, 519 (D. Mass.

2017) ("In making that finding, the ALJ considered evidence from State Agency doctors . . . and gave their opinions great weight. *They found Yearling was capable of performing light physical activity.* The ALJ also gave great weight to the opinions of [other] State Agency doctors . . . *who concluded Yearling was mentally capable of performing simple tasks*." (emphasis added)).

### 2. Discounting Treating Opinions

Next, Plaintiff contends that the ALJ failed to state good reasons for choosing not to rely on the opinions of Dr. Gobeil, LICSW Pagan, and Dr. Cruz. Treating sources are typically given special deference. *See* 20 C.F.R. § 404.1527(c)(1); 416.927(c)(1) ("Generally, we give more weight to the opinion of a source who has examined you than the opinion of a source who has not examined you."); *see also Richards v. Hewlett-Packard Corp.*, 592 F.3d 232, 240 n. 9 (1st Cir. 2010) ("[T]reating physicians' opinions are ordinarily accorded deference in Social Security disability proceedings."). Thus, a treating source opinion that is well-supported by objective evidence and not inconsistent with the record is accorded "controlling weight." 20 C.F.R. § 404.1527(c)(2). "If not 'controlling,' the treating opinion must still be evaluated against six criteria in order to fulfill the mandate that the ALJ 'always give good reasons' when determining the weight a treating opinion deserves." *Santana v. Colvin*, 2016 WL 7428223, at *3 (D. Mass. Dec. 23, 2016); *see also* 20 C.F.R. § 404.1527(c) (identifying the six relevant criteria which tend to support or contradict a medical opinion).

An ALJ is "entitled to resolve conflicts in the record, and may reject the opinion of the treating physician so long as an explanation is provided and the contrary finding is supported by substantial evidence." *Tetreault v. Astrue*, 865 F. Supp. 2d 116. 125 (D. Mass. 2012) (citations omitted); *see also Keating v. Secretary of Health and Human Services*, 848 F.2d 271, 276 (1st Cir. 1988) ("[T]reating physician's conclusions regarding total disability may be rejected by the

Secretary especially when, as here, contradictory medical advisor evidence appears in the record."); *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass. 2004) ("The relevant regulations further permit the ALJ to downplay the weight afforded a treating physician's assessment of the nature and severity of an impairment where, as here, it is internally inconsistent or inconsistent with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians.").

However, "even when an ALJ does provide reasons for discounting a treating source opinion, remand is proper if those reasons are 'unpersuasive' or 'significantly flawed.'" *Santana v. Colvin*, 2016 WL 7428223, at *3 (quoting *Johnson v. Astrue*, 597 F.3d 409, 411-12 (1st Cir. 2009)). According to agency policy, "the decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5. "These rules are not formalities. They are intended to allow 'claimants [to] understand the disposition of their cases,' and provide a reviewing court with an adequate record to review disability determinations." *Perry v. Colvin*, 91 F. Supp. 3d 139, 152 (D. Mass. 2015).

### a. Dr. Gobeil

The ALJ gave Dr. Gobeil's opinions no weight because he found "no basis in the record for those views and, indeed, much evidence in the record which is inconsistent with them, including his own observations of the claimant made the same day he concluded she was, in effect, disabled . . . Further support for my conclusions regarding Dr. Gobeil's views is found at Exhibit 22F, in which he noted during August 2013 that the claimant enjoyed GAF scores of between 85-90." (AR 38).

First, the GAF score assigned to Plaintiff is 2013 is irrelevant to this claim as Plaintiff's alleged disability began in March 2014. The ALJ contended that Dr. Gobeil, however, "never explained why two years later, he deemed her disabled, and what caused such a radical change in her condition." (AR 39). That Plaintiff's condition worsened, does not inherently render Dr. Gobeil's internally inconsistent. Indeed, the inability to pinpoint the trigger of deepening depression and heightened anxiety is an unpersuasive rationale for discounting a treating medical opinion. Moreover, "[t]he GAF is a diagnostic tool developed by an association of medical professionals; it was not intended to be a yardstick for measuring disabilities within the scope of the Social Security Act." *Resendes*, 780 F. Supp. 2d at 138.

Defendant also contends that Dr. Gobeil's Medical Source Statement and his treatment records from the same day reveal internal inconsistencies. (AR 38). However, it is difficult to ascertain what the ALJ found inconsistent. Indeed, on July 16, 2015, Dr. Gobeil noted that Plaintiff was depressed and anxious. (AR 680). This is consistent with the anxiety and depression noted in his Medical Source Statement that he believed compromised her ability to maintain employment. (AR 667-673). Defendant argues that Dr. Gobeil noted the same day that Plaintiff was alert and oriented, her language was normal, she was not experiencing suicidal ideation, delusions, or hallucinations, her thought process was within normal limits, and she had no side effects from her medications. (AR 680-681). But these findings are not inconsistent with findings of anxiety and depression that allegedly rendered Plaintiff disabled.

Finally, the ALJ noted "much evidence in the record which is inconsistent" with Dr. Gobeil's findings. (AR 38). But the ALJ pointed to no specific parts of the record to support this conclusory statement. From his opinion, it is impossible for a reviewing court to ascertain which parts of the record he believed inconsistent with Dr. Gobeil's findings. *See Tetreault*, 865 F. Supp.

2d at 125 (D. Mass. 2012) (noting an ALJ is "entitled to resolve conflicts in the record, and may reject the opinion of the treating physician *so long as an explanation is provided and the contrary finding is supported by substantial evidence*." (citations omitted)); SSR 96-2p, 1996 WL 374188, at *5 ("[T]he decision must contain *specific reasons* for the weight given to the treating source's medical opinion . . . *sufficiently specific* to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.").[4]

### b. LICSW Pagan

The ALJ gave LICSW Pagan's views little weight. According the ALJ, "[a]lthough she has seen the claimant several times, her views are internally and materially inconsistent, in that the GAF score she awarded the claimant is inconsistent with a status of disability. Likewise, the functional degrees of limitation Ms. Pagan assessed the claimant as having is inconsistent with a status of disability." (AR 39).

A therapist is not among the "acceptable medical sources" listed in the Social Security Regulations, *see* 20 C.F.R. §§ 404.1513(a), 416.913(a), "and an ALJ is granted wide discretion in weighing a therapist's opinion." *Gagnon v. Astrue*, 2012 WL 1065837, at *5 (citing SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006)). Thus, "[w]hen deciding how much weight to give a therapist's opinion, an ALJ is only constrained by the duty to reach a conclusion supported by substantial evidence in the record." *Id.*

Regarding the functional limitations noted by Ms. Pagan in her Medical Source Statement, the ALJ alleges that they are inconsistent with a finding of disability. While the ALJ points to no specific parts of the record, presumably he refers to Ms. Pagan's Medical Source Statement. (AR 660). *See* SSR 96-2p, 1996 WL 374188, at *5 ("[T]he decision must contain specific reasons for

---

[4] While the ALJ's interpretation of Dr. Nesr's findings is inconsistent with the conclusions reached by Dr. Gobeil, as discussed above, I find the inferences drawn from Dr. Nesr's records unpersuasive.

the weight given to the treating source's medical opinion, supported by the evidence in the case record, and *must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight*." (emphasis added)).

When assessing Plaintiff's functional limitations, Ms. Pagan concluded that Plaintiff was seriously limited in understanding and remembering very short and simply instructions, carrying out very short and simple instructions, working in coordination with or proximity to others without being unduly distracted, performing at a constant pace without an unreasonable number and length of rest periods, and getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (AR 663-664). In addition, Ms. Pagan found Plaintiff unable to meet competitive standards in completing a normal workday and workweek without interruptions from psychologically based symptoms, accepting instructions and responding appropriately to criticism from supervisors, responding appropriately to changes in a routine work setting, dealing with normal work stress, and being aware of normal hazards and taking appropriate precautions. *Id.* It is unclear how these functional limitations are "internally and materially inconsistent" with a finding of disability.

The ALJ additionally found that the GAF score assigned by Ms. Pagan to Plaintiff was inconsistent with a finding of disability. On July 22, 2014, Ms. Pagan assigned Plaintiff with a GAF score of 56. (AR 541). This score indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. *See* DSM–IV 34. Plaintiff notes that Dr. Nesr later assigned Plaintiff a GAF score of 45, (AR 710), which indicates "severe symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)." DSM–

IV 34.  Therefore, Plaintiff argues that the later GAF, *is* consistent with Ms. Pagan's finding of disability.

However, because the ALJ has wide discretion to assess Ms. Pagan's opinions, I find that it was reasonable for the ALJ to conclude that the GAF score Ms. Pagan assigned Plaintiff is inconsistent with her later finding of disability.  Therefore, substantial evidence supported the conclusion that her opinion merited little weight.

### c.  Dr. Cruz

The ALJ gave Dr. Cruz's opinions little weight because they were "not supported by medically acceptable clinical or laboratory diagnostic techniques.  For example, he observed at Exhibit 21F that the claimant was *likely* to suffer a variety of side effects from medication, though he did not say she actually did suffer from any of them." (AR 39) (emphasis in original).

As Dr. Cruz is a treating physician, the ALJ's rationale for discounting his opinion must be persuasive. *Santana*, 2016 WL 7428223, at *3.  The ALJ argues that Dr. Cruz's opinions are flawed because he does not say if Plaintiff suffered side effects.  The ALJ is apparently impugning Dr. Cruz's credibility because he answered the questions asked by the Medical Source Statement. The questionnaire only asks if there is "a reasonable medical probability that [Plaintiff] will experience side effects from the medication(s)?" (AR 719).  Dr. Cruz found concluded that there was. *Id.*  Further, even if Dr. Cruz failed to properly support these observations, his disability determination was not grounded only on the likelihood of side-effects from Plaintiff's medications. Dr. Cruz also identified psychological conditions that contributed to Plaintiff's functional limitations. *Id.*  Indeed, it seems from Dr. Cruz's questionnaire that in his opinion, Plaintiff's psychological conditions played a larger role in her disability.  While he believed that side-effects would "frequently" interfere with Plaintiff's attention and concentration, he noted that Plaintiff's

stress would "constantly" interfere. *Id.* Further, Dr. Cruz notes that "she gets *anxious* at work. She has no energy to do things due to *depression*." (AR 720) (emphasis added). Neither Plaintiff's anxiety nor her depression are side-effects of her medications.

At most, it was reasonable for the ALJ to dismiss Dr. Cruz's conclusions with respect to limitations resulting from Plaintiff's medications. However, this does not create internal inconsistencies in Dr. Cruz's findings as none of his conclusions imply that Plaintiff is not disabled. Moreover, the ALJ does not point to any specific parts of the record he finds inconsistent with Dr. Cruz's determinations. *See Arruda*, 314 F. Supp. 2d at 72 (concluding that internal inconsistencies or contradictions with the larger record are acceptable reasons to downplay a treating physician's opinion). As such, the ALJ must offer more persuasive reasons for discounting the opinion of Dr. Cruz.

### 3. Credibility Assessment

Finally, Plaintiff argues that the ALJ's credibility assessment was not sufficient. In determining whether a claimant is disabled, the ALJ must consider statements or reports from the claimant regarding their symptoms and functional limitations. 20 C.F.R. § 404.1529(a); 416.929(a). However, a claimant's subjective description of symptoms alone cannot establish disability; the ALJ must also consider any other available evidence, including objective medical evidence, to determine whether the claimant's testimony is consistent with the remainder of the record. 20 C.F.R. § 404.1529(a), (c); 416.929(a), (c). *See also Grady v. Astrue,* 894 F.Supp.2d 131, 142 (D.Mass.2012). Evaluating the entire record in this manner requires the ALJ to make a finding about the credibility of a claimant's statements. SSR 96–7p, 1996 WL 374186 at *1.

Although the ALJ's credibility determination warrants deference, he "must make specific findings as to the relevant evidence he considered in determining to disbelieve the appellant." *Da*

*Rosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986); *Frustaglia v. Sec'y of Health & Human Servs.,* 829 F.2d 192, 195 (1st Cir.1987) (noting that the ALJ's credibility determination "is entitled to deference, especially when supported by specific findings."); *see also Bazile v. Apfel*, 113 F.Supp.2d 181, 187 (D. Mass. 2000) ("General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.").

Here, the ALJ concluded:

> [T]he claimant's allegations of disability [are] not fully credible. As regards her mental impairments, it appears these are debilitating only in the presence of external exasperation (such as an abusive companion or coworker).
>
> As regards to her physical impairments, no evidence has been presented which would show that, with sufficient accommodation as expressed in my assessment of the claimant's residual functional capacity, she would be unable to engage in at least some SGA.

(AR 38). First, the ALJ's assessment of Plaintiff's credibility with respect to her mental impairments fails simply because it misrepresents the record. On December 15, 2013, LMHC Petter noted that Plaintiff experienced anxiety because of experiences with a specific male coworker. (AR 427).[5] While this observation was before the onset of Plaintiff's alleged disability, on August 15, 2015, LMHC Petter again noted the problems Plaintiff had with the coworker. (AR 863). But concluding that Plaintiff's symptoms are debilitating only in the presence of external exacerbation is belied by a complete reading of LMHC Petter's findings. LMHC Petter recounted Plaintiff's past traumas only to explain her psychological condition. For instance, LMHC Petter noted that Plaintiff grew up in Nicaragua during the civil war and "lived in chaos." *Id.* She fears her father "since his temper was erratic." *Id.* She felt "unsafe in her home as a child" because "[h]er house had an open section of roof, and at night people would sneak in and walk around."

---

[5] The ALJ misattributed this conclusion to Dr. Cruz. (AR 36 n.12).

*Id.* "She felt unsupported emotionally" by her husband. *Id.* Finally, she worked with someone "who tried to intimidate her, and triggered her trauma issues. She had been raped in her early 20's and feared this man would do the same." *Id.* As a result, LMHC Petter concluded that Plaintiff was disabled by "her extreme depressive and anxious symptoms." *Id.*

Importantly, LMHC Petter did not conclude that Plaintiff was only disabled when there were external triggering events. That certain triggers exacerbate Plaintiff's symptoms is an unremarkable proposition. This does not mean, however, that she can calmly and happily work in a building until the roof is removed. Moreover, the record contains opinions that the ALJ improperly disregarded stating that her psychological conditions preclude employment without reference to any triggering conditions. *Cf. Lappen v. Astrue*, 792 F. Supp. 2d 98, 104 (D. Mass. 2011) (holding that the ALJ properly found a claimant not credible because the ALJ "based his credibility determination *on the whole record*", because the claimant "claimed to not be able to get out of bed on most days, [but] the medical evidence showed that she had engaged in activities outside her home, including working with a personal trainer", and because of claimants "untruthfulness in her interactions with her doctors." (emphasis added)).

Regarding Plaintiff's physical impairments, the ALJ's rationale for finding Plaintiff not credible is flawed because he used his own RFC determinations to discredit her testimony. *See Cabral v. Colvin*, 2013 WL 4046721, at *8 (D. Mass. Aug. 6, 2013) ("It is improper for an ALJ to make an RFC determination and then use it to discredit plaintiff's complaints of pain."); *Longerman v. Astrue*, 2011 WL 5190319, at *15 (N.D. Ill. Oct. 28, 2011) ("As the Seventh Circuit has made clear, finding statements that support the RFC credible and disregarding statements that do not 'turns the credibility determination process on its head." (quoting *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003)); *Smollins v. Astrue*, 2011 WL 3857123

(E.D.N.Y. Sept. 1, 2011) (holding that the ALJ "merely compared [claimant's] statements regarding her symptoms to his own RFC assessment [and thus] failed to follow the dictates of the Social Security regulations in performing his credibility assessment."). Defendant argues that the ALJ simply noted that "no evidence had been presented which would show that with sufficient accommodations, as expressed in the RFC finding, she would be unable to engage in some substantial gainful activity" and that this reasoning "is different form concluding that her subjective complaints are only supported to the extent that they are consistent with the RFC finding." (Docket No. 21, at 19). Contrary to Defendant's contentions, the ALJ seems to suggest that Plaintiff's testimony is presumptively untrue insofar as it contradicts the ALJ's RFC assessment. The ALJ implies that the Plaintiff has the burden of presenting objective evidence to overcome this presumption but "the absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individuals' credibility and must be considered in the context of all the evidence." SSR 96-7p, 1996 WL 374186 at *6.

## Conclusion

For the reasons stated above, I conclude that the ALJ improperly relied on his lay opinion in crafting Plaintiff's RFC. In addition, the ALJ failed to provide adequate reasons for disregarding medical opinions of Drs. Gobeil and Cruz and for finding Plaintiff's testimony not credible. Thus, Plaintiff's motion (Docket No. 18) is **_granted_**, Defendant's motion (Docket No. 20) is **_denied_**, and this case is **_remanded_** for a new hearing.

**SO ORDERED.**

                                        _/s/ Timothy S. Hillman_
                                        **TIMOTHY S. HILLMAN**
                                        **DISTRICT JUDGE**